LOUIS EMERY *v.* MONONGAHELA WEST PENN PUBLIC SERVICE
COMPANY

(No. 7126)

Submitted March 2, 1932.   Decided March 15, 1932.

*James A. Meredith, Ernest R. Bell,* and *K. C. Moore,* for plaintiff in error.

*L. C. Musgrave* and *J. Worley Powell,* for defendant in error.

LIVELY, JUDGE:

Defendant prosecutes error to a $1,500.00 verdict and judgment thereon awarded as damages for injuries sustained by him when defendant's street car struck an automobile truck driven by plaintiff.

The collision occurred at a point in the city of Fairmont where Murray Avenue intersects (but does not cross) Pennsylvania Avenue, about noon on January 18, 1930. The weather was cloudy; the streets were icy and there was two inches of snow on the ground at eight o'clock that morning, and a little snow fell between 8:30 and 9:30; the wind was blowing and the temperature of 20 degrees, registered at eight o'clock, remained constant during the day. Murray Avenue, as it ascends from Pennsylvania Avenue, has a grade of 13.6 per cent.; its pavement is twenty feet wide; there is no curbing on either side of the pavement, but dirt banks about five feet high ascend from each side thereof. A traffic sign marked "Thru Street Stop" stood on Murray Avenue at the intersection where the collision occurred. Defendant's car tracks paralleled Pennsylvania Avenue but ran along the eastern side thereof, outside of the paved portion of the avenue, within six or eight feet of the point at which Murray Avenue began, and on a grade of seven or eight per cent. A concrete wall, about ten feet high, on Pennsylvania Avenue, and a dirt bank thereon obstructed the view of traffic on Murray Avenue

from the motorman on defendant's car, which was described as a "one-man" car, forty-five feet long and weighing about 54,000 pounds. .

Plaintiff had, a few minutes before the accident occurred, driven his Dodge truck, loaded with coal, over the crossing at the intersection of Pennsylvania Avenue and Murray Avenue and had ascended Murray Avenue for the purpose of delivering the coal. His truck was equipped with chains and his brakes were in good condition. Having delivered the coal, he attempted to return by way of Murray Avenue; and because his truck "will go tolerable fast in low gear," he used his emergency brake, and when about forty or fifty feet away from the point where Murray Avenue intersects with Pennsylvania Avenue, his truck began to skid, and he released his brake and applied gas. This method was repeated each time his car would skid until he got within four or five feet of the nearer rail of defendant's tracks when he saw the street car seventy-five or eighty feet away. Plaintiff relates that, as he came down Murray Avenue, he continued to think of the crossing and tried, but couldn't run into the dirt bank; that he was driving at a rate of between four and six miles per hour when he started down Murray Avenue and that when he reached the intersection his speed had decreased; that when he saw the street car he put his car in reverse but "the wheels just spinned; didn't take hold," and the car continued to move forward; and that he cut his front wheels to the left or in the opposite direction from which the street car was coming, and opened the door of the truck to alight when the street car struck, inflicting a broken ankle and other injuries to plaintiff.

The motorman testified that just before the collision, his car was on descending grade and for that reason he had turned off the power and was running the car at a speed from twelve to fifteen miles per hour; that when he first saw the truck, it was "right up on" the near rail and the street car fifty or seventy-five feet away; that he could not have seen the truck sooner; and that, seeing it, he immediately applied his emergency brake and sand and blew the wistle. Other

witnesses, seated in various positions in the car, observed the truck when it was fifty or seventy-five feet from their respective seats; and one of those witnesses (Lora Yager), who sat about three feet from the motorman and who first observed the truck when it was three or four feet from the nearer rail, "felt the jar in the motion of the car" about thirty or thirty-five feet from the truck; while another witness (for defendant) sitting near the motorman, testified that the truck was across the track and had stopped on the crossing; that he observed the motorman "put the air on" but "didn't seem to take hold" quickly. Layman, a witness for plaintiff, who said that he was seated with John Hibbs about the center of the street car, observed the truck near the rail when the truck was fifty to seventy-five feet away from where he was seated; and Hibbs (as plaintiff's witness) although not certain whether the motorman was then talking with passengers or making change, stated that he (motorman) was not looking ahead and could have seen the truck "around 75 to 100 feet" away. Alex Tchinski, a witness for defendant, who stood on the left of the vestibule near the motorman, stated he first saw the truck forty or fifty feet from the crossing and that when the truck was about five feet from the track, the street car was fifteen or twenty feet away. Witnesses for both plaintiff and defendant testify that when they first saw the truck (fifty to seventy-five feet away), they remarked that the truck would be "hit," although they were not asked on what facts their remarks were predicated.

After the accident, the truck was in a ditch near a pole situate about sixteen and one-half feet from the crossing. Just where the street car stopped with reference to the front end of the truck is not clear, a witness for plaintiff testifying that the front end of the truck lacked less than a foot of reaching the pole and that the rear end of the car was fifteen feet past the front end of the truck (making the distance in which the street car stopped between 125 and 150 feet) whereas the motorman says he stopped within eighty-five feet. There is likewise a conflict in the evidence of opinion and of fact on whether the trolley rails were wet or dry when the accident happened, and a consequential variance on the dis-

tance in which the car should have been stopped, the variance being from ten or twelve feet to 225 feet.

Plaintiff's right of recovery is predicated upon the doctrine of last chance. In McLeod v. Laundry Company, 106 W. Va. 361, pt. 1, Syl., the rule is stated: "The doctrine of last clear chance is a qualification of the general rule that contributory negligence bars a recovery, and the principles of the doctrine is that, although the plaintiff has been negligent in exposing himself to peril, and although his negligence may have continued until the accident happened, he may nevertheless recover if the defendant after knowledge of plaintiff's danger, or by the exercise of ordinary care could have known, and having reason to suppose that he (plaintiff) may not save himself, could have avoided the injury by the exercise of ordinary care, and failed to do so;" and the rule "implies a sufficient interval of time for both appreciation of the danerous situation and effective effort to relieve it." Juergens v. Front, 111 W. Va. 670. Of course, if there is nothing other than concurring negligence of both plaintiff and defendant, there can be no application of the last clear chance doctrine. With the rule thus stated, we proceed to discuss plaintiff's instructions 6, 7 and 8, given by the court, and charged by defendant to constitute error.

Instruction No. 7 told the jury that even if they believed from the evidence that plaintiff was negligent in running his truck upon or near defendant's tracks, defendant is liable if, from a preponderance of the evidence, they believed that the motorman, by the exercise of ordinary care, saw, or should have seen, plaintiff's truck upon or in dangerous proximity to defendant's tracks and in a position of danger a sufficient time before the collision to have stopped, and failed to stop, his car, and that such failure caused (and was the proximate cause of) plaintiff's injuries, then the jury should find for plaintiff unless the jury believed that plaintiff was guilty of contributory negligence. Instruction No. 8 told the jury that even if plaintiff's negligence continued up to the moment of injury, defendant is liable if the motorman, by the exercise of due care, knew, or should have known, plaintiff's peril and that defendant's motorman failed to avail himself of the

last clear chance and negligently failed to stop said car, which negligence was the proximate cause of plaintiff's injuries, unless the jury finds that plaintiff was contributorily negligent. Counsel for defendant contends (1) that the instructions are misstatements of the last clear chance doctrine, in that plaintiff's concurring or contributory negligence at the time of the collision would bar a recovery, and (2) there was not sufficient evidence on which to base these instructions.

It is true that court decisions are replete with the rule that the last clear chance doctrine has no application where the negligence of the person injured and of the defendant are concurrent, each of which at the very time when the accident occurrs contributes to it. *McLeod* v. *Laundry, supra; Walter* v. *Ry. Co.,* 108 W. Va. 576, 152 S. E. 13. Instruction No. 5, given by the court, explained to the jury that failure on plaintiff's part to use ordinary care for his own safety constituted contributory negligence, and that to find plaintiff guilty thereof, they must believe *at the time* and immediately preceding the accident plaintiff did, or failed to do, something which the ordinary, prudent person would have done under the circumstances, which failure to use such ordinary care was the proximate cause of his said injuries. Since instructions correctly propounded are to be read in the light of each other, we do not believe that the jury was misled or that the instructions are misstatements of the law. The doctrine of last clear chance is an exception to the rule of contributory negligence. There is always primary negligence on plaintiff's part whenever the doctrine of last clear chance applies, so that the concurring or contributory negligence necessary to preclude plaintiff's right of recovery arises upon plaintiff's consciousness of his peril and his duty and ability to escape therefrom. See *Smith* v. *Gould,* 110 W. Va. 579, 159 S. E. 53, for a full discussion of last clear chance doctrine. The primary negligence may continue up to the moment of injury, but if, at some point after the primary negligence begins, circumstances become such that plaintiff should exercise ordinary care to relieve the perilous situation, his failure to do so will make him guilty of contributory or concurring

negligence. Hence, instruction No. 8, which told the jury that defendant was liable even though plaintiff's negligence was constant to the time of impact likewise told them, in the light of instruction No. 5, that plaintiff's failure to exercise ordinary care at the time of or immediately preceding injury would constitute contributory negligence.

Nor is defendant's contention that there is not sufficient evidence on which to base instructions 7 and 8 tenable. The basis of the last clear chance doctrine is defendant's knowledge, actual or imputed, of plaintiff's peril and an appreciable interval of time for avoidance between such knowledge and the injury. There is some evidence that the motorman was not keeping a proper lookout and that he could have seen the truck on the crossing at a distance of 75 to 100 feet therefrom. The motorman himself testified he saw the car fifty to seventy-five feet away so that the gist of the controversy is whether the motorman acted with due diligence. That the imminency of danger was apparent to defendant's employee is clearly indicated by the motorman's testimony that, perceiving plaintiff on the tracks fifty to seventy-five feet away, he immediately acted to apply his brakes, etc. He himself says that he stopped within eighty-five feet after he saw plaintiff's truck. There is evidence, too, for the jury to consider that the car, travelling at a speed of twenty-two feet per second, could have been stopped within ten or twelve feet. While it is true that the hypothetical questions asked experienced carmen by plaintiff's counsel as to the distance in which the car could be stopped were based on the plaintiff's statement that he had observed the car tracks the morning of the collision and they were dry, it is likewise true that the hypothetical questions propounded by defendant to its expert witnesses were based on evidence of its witnesses that the tracks were wet, one witness for defendant saying that with a dry rail and sand applied, the car would stop within fifty to seventy feet; and there was likewise a contrariety of *opinion* as to whether the weather conditions, the running of cars over the rails shortly before the collision, and the other circumstances would make for a dry or wet rail. This discussion

likewise disposes of defendant's argument that a peremptory instruction in its favor should have been given.

Instruction No. 6 told the jury that:

"* * * even though you believe from all the evidence and circumstances proven in this case, that the plaintiff at the time of the accident mentioned in the evidence, was guilty of negligence which might have produced injuries to the plaintiff, complained of in his declaration, but before the injuries actually resulted the defendant was guilty of negligence which was the immediate and proximate cause of the injuries and damages sustained by the plaintiff, the negligence of the defendant then became in law, the sole proximate cause of the injuries, even though no injuries could have resulted to the plaintiff if the plaintiff himself had not ben guilty of negligence. The negligence of the defendant (if the jury finds the defendant guilty of such negligence) supervening between the original negligence of the plaintiff and the happening of the injuries, destroys the legal force of the negligence of the plaintiff as a contributory cause of the injuries."

That instruction is based on point 5, Syl., of *Riedel* v. *Traction Company*, 69 W. Va. 18, 71 S. E. 174. Defendant points out that the syllabus of the *Riedel* case contained the word "originally" between "been" and "guilty" in the last clause of the first sentence, and complains that the instruction tells the jury "as a matter of law, that the negligence of the defendant, regardless of when it may have happened in relation to the accident, supervened between the negligence of the plaintiff and the happening of the injuries to the plaintiff, and destroys the legal force of plaintiff's concurring or negligence;" and further that the instruction "indicates that the negligence of plaintiff was concurring at the time of the accident." The *Riedel* case is criticised adversely by Judge Hatcher in *Keller* v. *Railway Co.*, 109 W. Va. 522, 527, 156 S. E. 50. By the instruction, the legal force of plaintiff's contributory negligence would be nullified simply by the supervening negligence of defendant, although the contributory negligence occurred at the time of the accident. It

renders defendant liable when there is no reason for the application of the doctrine of last clear chance; it vitiates the reason for applying the exception. Since the case is being reversed for other reasons hereinafter discussed, we stamp the instruction as inaptly drawn.

We do not think there was error in the refusal of defendant's instructions 11, 13, 19 and 26. Instruction 11-A was substituted by the court for number 11, and substantially covers the elements of the one refused. Instruction No. 13, termed as a "common sense" instruction, would have told the jury that they should judge the evidence "by that experience and observation of human affairs of which you are possessed as individual members of society;" and that they need not take for granted unusual claims; and that its findings should be upon "proof of a reliable character and which satisfies the mind." The essence of the instruction is covered in other instructions; and since we must presume that jurors exercise common sense in reaching their verdicts, we do not think the court's refusal so to instruct constitutes error. Instruction No. 19 is not based on the evidence and, therefore, properly refused. By Instruction No. 26, the jury would have been instructed that plaintiff's duty required him to stop on Murray Avenue before entering upon the crossing to see if there was any traffic approaching on Pennsylvania Avenue. Plaintiff testified that he could not have stopped because of the condition of the street, and there is no evidence controverting his statement. Moreover, the instruction is covered by other given instructions.

Defendant was refused two instructions on the unanimity of the jury in finding the verdict. They would have told the jury that if any member, after hearing and considering all the evidence, and receiving instructions, and listening to arguments of counsel, and after consulting with his fellow jurors in the jury room, is not convinced as to the verdict to be rendered, it is his duty not to surrender his own convictions simply because other jurors are of different opinion. No instruction was given on the unanimity of the verdict. Plaintiff says (1) it was not error to refuse the instructions, because this is not a criminal case (where such an instruction

is proper); and (2) because the jury was told that the burden of proof was on the plaintiff to make out his case by a preponderance of evidence, and therefore there was no harm done by refusal of the unanimity instructions.

At common law unanimity of a verdict was required in both civil and criminal cases, and Vol. 1 of Brickwood's Sackett's Instructions, sec. 264, says that it is a requirement under the constitutions of most of the states of the union. Whether the requirement is wise or not( and there has been criticism of it), we are bound by the common law, unless changed by our constitution or statutes (Const., Art. VIII, sec. 21), and there has been no change by either. A litigant in either a civil or criminal case has the right to have the jury instructed upon their unanimity in reaching a verdict, so long as the instruction is not couched in terms which would invite obduracy or disagreement. In *State* v. *McKinney,* 88 W. Va. 400, 106 S. E. 894, an instruction, couched practically in the same terms as those rejected in the instant case, was held to be a proper instruction and should have been given, unless covered by some other given instruction. The instruction in *State* v. *McKinney,* would have told the jury that, if any juror after due consideration of the evidence and consulation with his fellow jurors, should entertain a reasonable doubt of the guilt of the accused, it was his duty not to surrender his own convictions simply because the others were of a different opinion. It was there said that no misleading element was in the instruction, and it did not import justification or encouragement of obduracy or arbitrariness on the part of an individual juror. A similar instruction which left out consulation with fellow jurors was held to be proper in *State* v. *Noble,* 96 W. Va. 432, 123 S. E. 237, and refusal to give it was error. Similar instructions were held to be proper in *State* v. *Joseph,* 100 W. Va. 213, 130 S. E. 451, and in *State* v. *Edgell,* 94 W. Va. 198, 118 S. E. 144. In *Brogan* v. *Traction Co.,* 76 W. Va. 698, 86 S. E. 753, 756, we recognized the rule at common law upon unanimity as follows: "Unanimity in the finality of a verdict was and is the rule of the common law, and it is the rule in this state, and the jury may righly be so instructed"; citing *McCue* v. *Com.,* 103

Va. 870, 49 S. E. 623. The refusal of the instruction in the *Brogan* case was held not to be error for it would have been misleading and forestalled due deliberations in the jury room, and encouraged obduracy during the entire process of reaching a conclusion, as set out in point 10 of the syllabus. It is proper for a trial court to tell the jurors that it is their duty to agree if possible and that in conferring they should respect each other's opinion with a disposition to agree thereto, if based on sound reasoning; but while it is contemplated that jurors will harmonize their views in discussing the case in the jury room, if possible, the law does not contemplate or permit them to compromise, divide or yield their conscientious convictions for the mere purpose of reaching a verdict. See *Goodsell* v. *Seeley*, 46 Mich. 623, 10 N. W. 44, 41 Am. Repts. 183, where the jury reported they could not agree and stood divided eleven to one on $200.00, and the judge told them it would be better for one or both sides to yield, and that a disagreement over so small a matter would be unfortunate. This instruction was held to be error. In *Richardson* v. *Coleman*, 131 Ind. 210, 31 Am. St. Repts. 429, 29 N. E. 909, the jury had retired and were recalled when they were given another instruction which told them: "It is important to the parties to have this case decided. You will, I trust, in your deliberations, be careful to avoid the influences of undue pride of personal opinion. The law which requires unanimity on the part of the jury render a verdict expects and will tolerate reasonable compromises and concessions. You will remember, gentlemen, that absolute certainty is not always attainable in human affairs, neither does the law require it. Whilst it is expected that there will be individual opinion, judgment, and conscience, it is also expected that it will not go to the extent of unreasonable obstinancy." The appellate court held the instruction to be erroneous because it said "the law which requires unanimity on the part of the jury to render a verdict expects and will tolerate reasonable compromise and fair concession." A juror should not agree to a verdict simply because other jurors agree, if, under his oath and conscience, he does not believe it to be right. That is the law pertaining to the finding of a verdict, and a litigant has the right to have

the jury so instructed. We think it would be proper to tell the jurors that each should act in arriving at the verdict with proper regard for the opinion of other jurors; that they should agree if they can conscientiously do so; that in conference they should listen to and consider each other's views, and that a juror should not tend to consider his own conclusions infallible. No such instruction was asked for by plaintiff. On the other hand, we have held in many cases cited above that the instructions offered does not invite obduracy or disagreement and should be given. If an instruction properly propounds the law a litigant has the right to have it given in his own language if it is not vague, obscure, ambiguous or calculated to mislead. *Baltimore, etc.* v. *Lafferty,* 14 Grat. 478; *Jordan* v. *Benwood,* 42 W. Va. 312, 26 S. E. 266. But it is argued that the principle of law in the unanimity instructions refused is embodied in the instruction telling the jury that the burden of proof was on plaintiff to make out his case by a preponderance of the evidence before the jury could find for him. That instruction simply told the jury upon whom the burden rested to show the negligence charged and the quantum (predonderance) necessary to throw the scales in his favor, and had nothing to do with the amount of the verdict, nor the unanimity of the jurors in arriving at a verdict either for or against either party. That stereotyped instruction, given in practically every jury trial, does not include the common law unanimity principle. Unanimity does not refer to the burden of proof or quantum of evidence necessary, but relates solely to the ultimate and final conclusion reached, and has no reference to the method by which it is reached, or the facts upon which the different jurors base their conclusions. *C. & N. Ry. Co.* v. *Dunleavy,* 129 Ill. 132, 22 N. E. 15. It was error to refuse the instruction. The dictum in the *Brogan* case, if construed to hold that an instruction on the burden of proof renders unnecessary an instruction on the duty and right of each juror in agreeing upon a verdict, is disapproved.

As an item of damage plaintiff was permitted to prove loss of wages as a result of his injuries, over the objections and exceptions of defendant properly preserved. There is no

allegation in the declaration on which a loss of wages can be based. The damages sought to be recovered are for injuries to the person and for medical and hospital bills. It is elementary that the proof must correspond with, and have basis in, the declaration or bill. *Minotti* v. *Young*, 99 W. Va. 97, 127 S. E. 913. "Loss of earnings is a kind of damage which is not regarded as a necessary consequence of such acts as are usually involved in actions to recover for personal injuries of a temporary nature and is not generally covered by the usual allegations of damages." 4 Sutherland, Damages, p. 4705, sec. 1247. Plaintiff's counsel does not controvert this law, but relies upon his bill of particulars which contains an item for loss of wages. It is argued that the bill of particulars gave defendant sufficient notice that plaintiff would claim loss of wages. That argument is not sound, for a bill of particulars is not a part of the declaration. *Robinson* v. *Board*, 70 W. Va. 66, 73, S. E. 337, citing *Riley* v. *Jarvis*, 43 W. Va 43, 26 S. E. 366. Items in a bill or particulars cannot be proven unless there is something in the declaration on which to base the items and evidence. *Riley* v. *Jarvis*, 43 W. Va. 43, cited and followed in many subsequent cases. A different case from the declaration cannot be made by a bill of particulars. The office of a bill of particulars is not to set forth matters of evidence, but to inform the other party of the *cause* of action to be relied upon not set out plainly in the pleadings. *Clarke* v. *Ohio River R. Co.*, 39. W. Va. 732, 20 S. E. 696. Plaintiff relies upon *Bettman* v. *Skinner*, 113 Va. 24, 73 S. E. 436, for the proposition that evidence of loss of wages is admissible under a bill of particulars. The declaration in that case was for general damages only, and proof of loss of wages went in without objection, and the appellate court held that objection to such evidence could not be raised for the first time in that court. In the instant case, there was objection to the evidence on the specific ground that there was no allegation in the declaration on which to base the evidence, but the court admitted it because the bill of particulars specified loss of wages. Without an amendment to the declaration the evidence was not admissible and it was error to admit it.

The judgment is reversed, verdict set aside and a new trial awarded.

*Judgment reversed; verdict set aside; new trial awarded.*
*Louis Emery* v. *Monongahela West Penn Public Service Co.*

MAXWELL, J.,(concurring) :

I concur in the result, but I cannot share the view that the trial court erroneously rejected defendant's instructions 12 and 12a, on unanimity. Of course there must be unanimity of the jurors before a verdict can be had; that is fundamental. But my criticism of the said two instructions goes to their overemphasizing the thought of individual and independent action on the part of jurors. Even a good thing may be overdone. It is my judgment, that the consequence of such instructions in the trial of cases is to make the returning of verdicts more difficult, with resultant detriment to the administration of justice; further, that an instruction which lays pronounced emphasis on a juror's right to "hold out," without at the same time giving even passing mention to the juror's equally important duty of using his efforts towards a harmonizing of the divergent views of the jurors to the end that the case may be settled and litigation ended, is lopsided and in practical effect constitutes an invitation for perversity, and a bid for a "hung" jury.